**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MEGGIE NGUYEN YOUNG, and | § | |
| NICOLAS LEON YOUNG | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| BAYLOR COLLEGE OF MEDICINE, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

NOW COME Meggie Nguyen Young and Nicolas Leon Young, Plaintiffs in the above-styled and numbered cause, and file their Original Complaint against Defendant Baylor College of Medicine. Plaintiffs would respectfully show the Court the following:

## I.  THE PARTIES

1.1    Plaintiff Meggie Nguyen Young ("Meggie Young" or "Dr. Meggie Young" or, together with Plaintiff Nicolas Leon Young, "Plaintiffs" or the "Youngs") is an individual residing in Harris County, Texas.

1.2    Plaintiff Nicolas Leon Young ("Nick Young" or "Dr. Nick Young" or, together with Dr. Meggie Young, "Plaintiffs" or the "Youngs") is an individual residing in Harris County, Texas.

1.3    Plaintiffs are married to one another, reside together, and have two children together.

1.4    Defendant Baylor College of Medicine ("Defendant" or "BCM" or "the university") is a private health sciences university, as well as federal contractor and grantee.

Defendant may be served through its registered agent for service of process, James Banfield, at 2450 Holcombe Blvd., Suite OW200, Houston, Harris County, Texas, 77030.

## II.  JURISDICTION AND VENUE

2.1    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because one or more of Plaintiff's causes of action is created by federal law, specifically Title VII of the Civil Rights Act of 1964 § 2000e *et seq*., and 41 U.S.C. § 4712. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

2.2    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Harris County, Texas, which is within this district and division.

## III.  FACTUAL BACKGROUND

### A.  OVERVIEW – BAYLOR DESTROYS OF THE CAREERS OF TWO WORLD-CLASS SCIENTISTS

3.1    World-renowned cancer and Alzheimer's researchers Drs. Nicolas and Meggie Young bring this suit against Defendant Baylor College of Medicine, a private Texas health sciences university, and a federal contractor and grantee. The university proclaims its core values of "Respect, Integrity, Innovation, Teamwork, and Excellence." https://www.bcm.edu/about-us/mission-vision-values

3.2    Regarding its research arm, where Plaintiffs contributed and excelled, the university says,

> "Located at the heart of the Texas Medical Center, the largest medical complex in the world, Baylor College of Medicine focuses the efforts of faculty, staff and trainees on improving health through science, scholarship and innovation. This vision is realized through collaborative research initiatives in which basic, translational, and clinical researchers work together across disciplines and specialties to discover fundamental insights into human health and disease and to apply their discoveries to develop new diagnostic tools and treatments. Collectively the research engines on the TMC campus are number two in nation funding from

the National Institutes of Health. Researchers collaborate across institutions creating a vast biomedical research ecosystem."

https://www.bcm.edu/research. If only Defendant had lived up to its self-proclaimed values. Instead, Defendant colluded with a Deputy Director at the National Institutes of Health ("NIH") in a retaliatory campaign against Plaintiffs' careers, and not only failed to stop discrimination and retaliation against Plaintiffs, but also retaliated against Plaintiffs for reporting illegal conduct occurring in their shared research laboratory and, by the university.

3.3     Dr. Meggie Young is a soft-spoken, petite Asian-American woman. As a nine-year old child, she narrowly escaped the communist Viet Cong regime, fleeing for her life with her mother under gunfire, and being captured and imprisoned. Through a United States-sponsored humanitarian operation program, she finally immigrated to America as a teenager, and soon pursued her dream of helping humanity through science. Meggie Young eventually earned her Ph.D. in Chemistry, becoming a highly productive Research Scientist in her husband Dr. Nick Young's laboratory at Defendant Baylor College of Medicine. Together, the Youngs contributed to breakthrough advancements in the treatment and cures of human diseases, established stellar and global reputations in the scientific community, and published regularly in top scientific journals, including *Nature* and *Cell*.

3.4     Plaintiffs' exalted careers suddenly changed beginning in Spring of 2024, when a small group of postdoctoral and graduate students in the Young lab, one of which was highly politically connected in the federal government, began a campaign of discriminatory (on the basis of their race, color, ethnicity, sex, and national origin), hostile workplace conduct against Plaintiff Meggie Young and an African-American postdoctoral student in the lab, Dr. Faith Joseph, whose national origin was Nigeria. The students stole equipment and supplies from the lab, attempted to frame plaintiff Meggie Young for the theft, and sabotaged Dr. Meggie Young's and Dr. Faith

Joseph's research experiments on multiple occasions, including destroying cell cultures donated by children dying of leukemia.

3.5    Both Plaintiffs reported the discrimination and hostile work environment taking place in the lab to their department chair and internal BCM investigators. Defendant, however, instead of correcting the situation, retaliated against Plaintiffs for reporting the illegal conduct, harassing them with multiple frivolous investigations, whereupon they were berated, falsely accused, and told that if Plaintiff Meggie Young did not stop reporting, and just keep her head down, they would face adverse consequences. Ultimately, Defendant Baylor College of Medicine took the promised adverse actions against Plaintiffs, first by placing Meggie Young on remote-only work, followed by placing both Plaintiffs on Administrative Leave without any due process. Defendant refused to provide Plaintiffs with copies of the allegations against them, or any specifically-worded charges of wrongdoing.

3.6    The Youngs learned that a Deputy Director of the NIH had threatened Defendant to either address Plaintiffs' employment (i.e., end it) or else lose all future NIH funding across the university. Nick Young thereupon blew the whistle to a member of Congress and to several offices at the NIH, including the NIH Inspector General's office. Defendant, through Plaintiffs' department chair, attempted to silence Nick Young, warning him that if the Youngs further reported discrimination, or attempted to report the coercion between the NIH and the university, Nick Young would be terminated.

3.7    Plaintiffs soon hired legal counsel, and each filed Title VII charge with the EEOC against Defendant BCM. A day after Nick Young's attorneys wrote to Defendant BCM's President and its legal counsel, Nick Young was reinstated to his position, but was placed on a professional improvement plan requiring him to do professional development trainings and placing negative

documentation in his permanent personnel file, thereby damaging his unblemished professional status and reputation. Defendant also warned Nick Young that if he attempted to report further wrongdoings by the colluding students in his lab, he would be accused of retaliation and face termination. Defendant's warnings flew in the face of undeniable proof of misconduct and fraud by the students.

3.8     Meanwhile, Dr. Meggie Young remained at home on administrative leave, blocked by Defendant from progressing in her scientific work, resulting in her missing vital deadlines for grant applications, publication submissions, and collaborations with colleagues in her field. Her professional reputation and scientific career were instantly damaged, and on February 14, 2025, Defendant, in a final act of retaliation, notifying her that her position as Research Scientist was being eliminated, effective March 16, 2025. At no time did Defendant provide copies of the allegations or investigative reports to either Plaintiff, despite written requests from Plaintiffs' legal counsel, and neither of the Youngs were offered or provided any form of due process.

3.9     As set forth below, Defendant Baylor College of Medicine discriminated against, and permitted discrimination against, Meggie Young, and fostered a hostile work environment against her. Defendant retaliated against both Plaintiffs for reporting the discrimination and hostile work environment, in violation of Title VII. Further, Defendant retaliated against both Plaintiffs for exercising their protected rights and duties, as scientists and citizens, to report the crimes taking place in the lab, and for Nick Young's reporting Defendant's complicity in the coercive action against the Youngs by a Deputy Director at the NIH.

3.10     To Plaintiffs, Defendant's corrupt, coerced, and wrongful conduct was reminiscent of the communist Viet Cong regime from which Meggie Young's family fled when she was a young child. Defendant BCM's conduct has permanently damaged Plaintiffs' professional

reputations and caused them severe mental and physical anguish, loss of past and future income, and violation of their civil, state, and federal rights.

## B.  BACKGROUND AND EVENTS RELEVANT TO ALL CAUSES OF ACTION

3.11    Drs. Meggie and Nick Young were married after meeting in college in 1995, and after finishing their graduate education, and starting a family, began work in the same lab together at Baylor College of Medicine in 2021. Having two spouses working in the same laboratory was commonplace and accepted at BCM, and their collaboration was successful until the events which led to this lawsuit. Nick Young had led a research lab at BCM since 2016, in which he, together with a long string of graduate and postdoctoral students over the years, churned out publication after publication, many in top scientific journals. Meggie Young fit right in when she joined the lab, until BCM permitted discrimination and retaliation to abruptly and wrongly severe this illustrious partnership. Both Plaintiffs had incredible personal and professional backgrounds, each having overcome personal challenges in their childhoods.

### Dr. Meggie Young, Research Scientist at Baylor College of Medicine

3.12    Dr. Meggie Young was hired as a Research Associate in BCM's Lester and Sue Smith Breast Center in Fall of 2019. In Fall of 2022, she transitioned to the position of Research Scientist in BCM's Department of Biochemistry and Chemical Pharmacology. Specifically, Dr. Meggie Young was hired to work in her husband's proteomics research lab. Due to concerns over a potential conflict of interest, Meggie Young never reported directly to her husband, but instead reported to, and was evaluated by, the department chair, Dr. Tim Palzkill ("Palzkill").

3.13    When BCM first hired Meggie Young, she had just finished her postdoctoral fellowship at University of Texas's MD Anderson Cancer Center, and had already published studies in multiple prestigious scientific journals. Her research, like her husband's, focused on

applying technological breakthroughs in proteomics to advancing possible treatments and cures for human diseases, including cancer.

3.14    As with many women in science, Dr. Meggie Young worked tirelessly each day to create a proper work-home balance, conducting groundbreaking scientific research while at the same time raising two children with Dr. Nick Young and maintaining a functioning household. In 2022, Dr. Meggie Young was offered a position as the Director of the Mass Spectrometry Laboratory at the University of California, San Diego ("UCSD"), which would have been a faculty position and would have paid a higher salary than her position at BCM. However, Dr. Meggie Young ultimately chose to decline the UCSD offer due to "family considerations that [were] beyond [her] own interests." She had no idea that her employer, and her husband's, would turn the couple's lives upside down, condoning and perpetrating unlawful actions against them both, or she would not have hesitated to take the UCSD job.

3.15    Meggie Young's grit and drive for scientific excellence, like her passion and determination to seek justice over Defendant BCM's wrongful actions alleged in this lawsuit, are grounded in the traumatic events of her youth. Plaintiff Meggie Young was born in Vietnam in 1975, just after the fall of Saigon. Meggie Young's father was Catholic and had worked with the United States, opposing the communists. Determined to get the family out of danger, Meggie Young's father secured seats for the family to fly to America, but in the chaos and danger taking place on the day they were scheduled to leave, the family was unable to reach the helicopters as they departed Saigon. Meggie Young's father was captured by the Viet Cong, and spent the next seven years in a reeducation camp, doing hard labor, wherein he became paralyzed for three years.

3.16    After her father recovered from the paralysis, Meggie Young's family planned their escape, only to have their plans discovered. On the day of their planned escape, the family literally

ran for their lives, eventually deciding to split up and run in opposite directions. Meggie Young's father and older sister ran into a banana field and escaped. Nine-year-old Meggie Young ran with her mother in the opposite direction, under gunfire, towards a waterfront village. They were captured and imprisoned for three days until finally being released along with another group of women and children. Meggie Young and her family were finally able to immigrate to the United States in 1993 under a humanitarian program.

**Dr. Nicolas Young, Tenured Associate Professor at Baylor College of Medicine**

3.17    Like his wife, Nick Young developed grit and determination as a young child that culminated in his becoming a top researcher in his field. He was born partially deaf, but after years of medical and therapeutic intervention, overcame his disability. Nick Young's childhood experience with disability instilled in him a desire to help others with disabilities, as well those from historically marginalized groups. He applied these convictions throughout his life, mentoring many disabled, women, and minority graduate and postdoctoral students, while advancing breakthroughs in the treatment and cure of human illness, particularly cancer and Alzheimer's disease.

3.18    After completing multiple prominent postdoctoral fellowships, including at Princeton University and at the National Cancer Institute, in 2016 Dr. Nick Young was hired as an Assistant Professor in the Verna & Marrs McLean Department of Biochemistry & Molecular Pharmacology at Baylor College of Medicine. At the time of his hiring by Defendant BCM, Dr. Nick Young had already authored and co-authored 37 publications in top-tier scientific journals, won numerous prestigious awards and grants including from NIH, and had achieved "Q" (top-secret) clearance with the Department of Energy.

3.19    In September of 2021, Nick Young earned tenure, with the title of Associate Professor. As Principal Investigator ("PI") over his laboratory, he was already running highly productive scientific enterprise, in which Dr. Meggie Young began collaborating that year. Together they were building a legacy of graduate and postdoctoral students. To date, Dr. Nick Young has authored nearly 70 studies in top scientific journals, including *Nature* and *Cell*.

**Drs. Nick and Meggie Young Meet and Establish their Scientific Careers Together**

3.20    Just two years after immigrating to America, Meggie Young enrolled as a Chemistry major with an emphasis on Analytical Chemistry and Instrumentation at University of California, Berkeley. It was there that she and Nicolas Young first met, initially as study partners in their physics and quantum mechanics classes, and eventually, dating, marrying, and becoming parents to their two children. Both would end up earning Ph.D.s and completing prestigious postdoctoral fellowships, ultimately merging their respective scientific careers at Defendant Baylor College of Medicine. They advanced through life and work together.

3.21    Drs. Nick and Meggie Young both earned stellar performance reviews each year of their employment at Defendant BCM. They were well-respected by faculty colleagues and administrators alike, and continuously collaborated with top researchers, both inside and outside of the university and worldwide. Dr. Nick Young also became highly active in shared governance activities at the university, such as strategic planning and university supply chain management, and was twice elected as a Senator on the university's Faculty Senate.

3.22    During Dr. Nick Young's service on the Faculty Senate, he expressed opinions that may have begun to draw negative attention from those at BCM who did not agree with him supporting powerless employees against unjust discrimination. On or around August of 2021, Nick Young voiced strong public opposition at Faculty Senate meetings to what he viewed as wrongful

and discriminatory conduct by BCM in terminating two Chinese-American, female faculty colleagues on account of their husbands working at universities in China.

**Plaintiffs Meggie and Nick Young's Successful Careers are Derailed by Defendant BCM.**

3.23    Plaintiffs' prolific scientific careers, and their entire lives, were abruptly and disastrously derailed beginning in or near May 2024. During that time, Plaintiff Nick Young supervised several graduate and postdoctoral students in his lab. As staff Research Scientist, Dr. Meggie Young worked with those students daily. Among the graduate and postdoctoral students in the lab were Dr. Faith Joseph ("Dr. Joseph"), a Black female postdoctoral student originally from Nigeria, Alyssa Paparella ("Paparella"), a White, female, physically disabled doctoral student, Karl Poncha ("Poncha"), a male doctoral student from India, and Dr. Bethany Taylor ("Dr. Taylor,") a White, female, physically disabled postdoctoral student.

3.24    Alyssa Paparella was no ordinary graduate student. Paparella had deep political connections in Washington, D.C. She served somewhat as a "poster child" for disabled graduate students under President Biden's administration, and was invited to the White House, where she met leaders from the NIH – the same federal agency funding most of the work in Dr. Nick Young's lab. Paparella would ultimately use her political connections to retaliate against the Youngs for reporting her malicious and discriminatory actions. Baylor College of Medicine, after tolerating and permitting Paparella and her fellow students to disrupt Nick Young's lab, was party to corruption involving Paparella's NIH contacts, as well as discriminatory and retaliatory actions against Plaintiffs.

3.25    In contrast, Dr. Faith Joseph was a model postdoc. She produced high quality science, published research for the lab, liked to work independently, and for several years had

maintained a pleasant disposition and collaborative relationship with Plaintiffs and other graduate students.

3.26    Beginning on or around Spring of 2024, Dr. Taylor, Poncha, and Paparella (collectively, "the three students") conspired together to create a hostile and discriminatory work environment against Dr. Joseph and Plaintiff Meggie Young. The three students perpetuated a campaign of belittling, humiliating, ignoring, and "ghosting" Dr. Meggie Young and Dr. Joseph, bullying and verbally attacking them on multiple occasions. The three students would make fun of Plaintiff Meggie Young's Vietnamese accent and non-native English, and Poncha would deliberately talk over Dr. Meggie Young, publicly telling her to "shush" during lab meetings.

3.27    On multiple occasions beginning on or about May of 2024, Dr. Taylor sent Plaintiff Meggie Young combative emails and text messages which included false allegations against her. On or about May 29, 2024, Dr. Taylor attempted to claim first authorship on a scientific publication for which Plaintiff Meggie Young and Dr. Taylor had fully collaborated. On May 30, 2024, after hearing complaints from Dr. Meggie Young and Dr. Faith Joseph, Dr. Nick Young called Dr. Taylor to discuss the matter and the complaints raised to him regarding Dr. Taylor's behavior. During the call, Dr. Taylor hung up on Nick Young mid-sentence. Plaintiff Nick Young called Dr. Taylor into a follow-up meeting, at which time Dr. Taylor expressed remorse over her prior conduct towards Dr. Meggie Young and Dr. Joseph, but also conveyed her displeasure at being called in for a meeting.

3.28    Between May and September of 2024, the three students escalated their hostile and discriminatory work environment against Plaintiffs and Dr. Joseph. On or about June 6, 2024, Dr. Meggie Young discovered someone had anonymously accessed the lab's data computer with unapproved software, transferring massive amounts of data. Meggie Young reported the situation

to PI Nicolas Young. Plaintiffs then made repeated requests for the person who transferred the data to identify themselves, but no one did. Plaintiffs later learned that the person who accessed the computer and transferred the data, but failed to identify herself, was Dr. Taylor.

3.29    As time went on during Summer 2024, the three students colluded, on multiple occasions, to violently sabotage Dr. Meggie Young and Dr. Joseph's research experiments (including pulverizing Dr. Joseph's cell culture dish), to steal lab equipment and supplies needed by Dr. Meggie Young and Dr. Joseph for their research projects, and to try framing Meggie Young for the theft. This misconduct compromised and ruined critical experimental samples, including cells derived from children suffering from leukemia, and novel therapeutics custom-synthesized for Dr. Joseph's project.

3.30    Between May and October of 2024, Plaintiffs Meggie and Nick Young both reported to Defendant Baylor College of Medicine's Human Resources ("HR") office and graduate program directors about the hostile and discriminatory work environment promulgated against Dr. Meggie Young and Dr. Faith Joseph by the three students, including their criminal activities in sabotaging experiments and stealing lab equipment and supplies. Dr. Joseph also reported to Employee Relations about Dr. Taylor's conduct. In retaliation for Plaintiff Meggie Young reporting the discriminatory and hostile work environment to Defendant BCM, the university promptly retaliated against Plaintiffs, harassing them with frivolous investigations into each of them.

3.31    On or about June 28, 2024, Defendant's Employee Relations Director, Leigh Knubley ("Knubley"), notified Dr. Nick Young that he was being investigated for alleged failure to accommodate Dr. Taylor's disability and his "conduct towards others," directing him not to discuss any aspect of the investigation with any other BCM employee. Knubley conducted her

investigative interview of Nick Young on August 12, 2024, during which she was harsh and aggressive towards him, yet referred to Dr. Meggie Young as an "aggressive pit bull."

3.32    On August 9, 2024, Meggie Young received an email from Knubley, notifying Meggie Young of "a report regarding [her] conduct towards others" and that a confidential investigation had begun. Knubley requested that Meggie Young meet with her virtually.

3.33    Like her husband, Plaintiff Meggie Young met with Knubley via Zoom on August 12, 2024, for an investigative interview, in which Knubley berated her. Knubley made clear, in multiple ways, that Meggie Young needed to "just keep her head down and do her job," and that she had overstepped her duties by reporting the conduct of the three students to PI Nick Young. Meggie Young was offended by Knubley's flood of condescending questioning and comments, which Plaintiff perceived as discriminatory against her on the basis of her status as an Asian female from Vietnam. Too often, discrimination against stereotypically petite, softspoken Asian women, like Meggie Young, takes the form of expectations they will be subservient, and if they are not, they are characterized as aggressive or hostile. This was certainly Knubley's reaction, when Meggie Young expressed her own view of events. During the investigative interview, Meggie Young reported the unprofessional and hostile behavior by Dr. Taylor to Knubley, and that the three students had acted in a discriminatory manner against Dr. Joseph on the basis of her race and national origin.

3.34    On or about August 30, 2024, Nick Young responded in writing to HR's investigative interview of him, and on or about September 3, 2024, Nick Young again responded in writing to HR, stressing that he had accommodated Dr. Taylor's disability (severe allergies) by permitting her to work fully remotely (and was himself deeply committed to accommodating students with disabilities, relating his own experience as a disabled child). Nick Young also stated

in his September 3, 2024, email to Knubley that the three students were "fomenting a toxic lab culture" and that he believed Knubley's characterization of Meggie Young as an aggressive "pit bull" was both sexist and racist. He further explained he believed if Meggie Young been a White male, she would not have been admonished for being a "rigorous and outspoken scientist."

3.35    In his September 3, 2024, email to Knubley, Nick Young compared Meggie Young's treatment to that of her former mentor, Dr. Matthew Ellis ("Ellis"), who is a White male, noting that Ellis, like Meggie Young, "insists that people work effectively, that the science is rigorous, and [that he] expects that others behave professionally." Yet, as Nick Young explained to Knubley, Ellis was praised for those professional attributes, while Dr. Meggie Young was labeled an aggressive pit bull and told to keep her head down and just do her job. In the same communication, Nick Young expressed to Knubley he felt BCM was failing to properly investigate the abusive and discriminatory behavior (previously reported to BCM by Plaintiffs) of the three students against Meggie Young and Dr. Joseph, that false accusations were being lodged at him and his wife, and that sexism and racism had no place in science or at BCM.

3.36    After learning that Dr. Joseph's experimental samples were once again sabotaged in the middle of the night by the three students on or about September 23, 2024, Nick Young again reached out to Knubley. Both in person and via email, on September 27, 2024, Nick Young reiterated that the toxic lab culture promulgated by the three students was continuing, and that was obligated to report and correct the behavior.

3.37    On October 2, 2024, Nick Young emailed Venkataram Prasad ("Prasad"), the Graduate Program Director for the department, notifying him that Poncha had been caught lying about missing materials from the lab, and that Dr. Joseph's childhood leukemia cell cultures had been sabotaged during the night.

3.38    At that point, Defendant Baylor College of Medicine had had enough of Drs. Meggie and Nick Young's internal reports of the ongoing discrimination (on the basis of race, color, sex, ethnicity, and national origin), the crimes of theft and sabotage, and the hostile work environment perpetuated by the three students. Defendant immediately retaliated against Plaintiffs. The morning after Nick Young's email to Prasad, on October 3, 2024, Dr. Meggie Young received an email from BCM's Manager of Employee Relations, Rebecca Oliver Bromenshenkel ("Oliver Bromenshenkel"), requesting a confidential meeting with Meggie Young that afternoon, to "relay information" for the case's closure.

3.39    During their October 3, 2024, meeting, Oliver Bromenshenkel took an aggressive tone with Meggie Young, reiterating Knubley's prior directive that Meggie Young should "just do her job," and that Dr. Meggie Young had been accused of berating and acting aggressively towards her lab mates. At the meeting, Meggie Young once again reported on the discrimination and hostile work environment she and Dr. Joseph were continually subjected to by the three students. When she informed Oliver Bromenshenkel that the three students had used curse words and ridicule against her, Oliver Bromenshenkel told Meggie Young she may not understand the [American] culture. When Dr. Meggie Young reported the wanton destruction and other sabotage by the three students, Oliver Bromenshenkel threatened Meggie Young with probable termination should she continue. Oliver Bromenshenkel then quickly adjourned the meeting, refusing to provide Meggie Young with copies of the complaint(s) against her, despite Meggie Young's repeated requests.

3.40    The next day, on October 4, 2024, Dr. Meggie Young sent a follow-up email to Oliver Bromenshenkel, reiterating that she wished to have the opportunity to defend herself against the allegations against her. Meggie Young explained she had still been denied seeing those allegations in writing, or even having them specifically presented to her orally. She expressed she

would take Oliver Bromenshenkel's advice of discussing the matter with the department chair, Palzkill. As explained above, Meggie Young directly reported to Palzkill so as to avoid having her husband as her immediate supervisor.

3.41    On or about October 9, 2025, Meggie Young met with Palzkill, updating him on her October 3, 2024, meeting with Oliver Bromenshenkel, and reiterating the ongoing hostile, criminal, and discriminatory activities against her and Dr. Joseph by the three students. During the meeting, Palzkill informed Meggie Young that he was removing her from working in the lab, and instead she was being assigned to work entirely remotely. At no time did Palzkill, or any other administrator, grant Dr. Meggie Young's request to be provided with copies of the complaint(s) against her so she could meaningfully respond. Palzkill encouraged Meggie Young to meet with the university Ombudsman, and to write a "rebuttal."

**Plaintiff Meggie Young likens Defendant's tyrannical conduct to the communist regime she escaped as a child.**

3.42    Shattered by all that was happening to her and feeling there was no end in sight to the injustices to which she and her husband were being subjected, Dr. Meggie Young sent an email directed to Oliver Bromenshenkel and Knubley, copied to Palzkill, memorializing her meeting with Palzkill the previous day, and expressing her utter shock and dismay at the manner in which she was being treated. Plaintiff also noted her fear of retaliation for "speaking honestly." In the email, Meggie Young conveyed to the administrators her incredulity over being shut up and punished, without ever having been shown the charges against her and or having any real opportunity to put forth a proper rebuttal. She went on to liken Defendant BCM's lack of due process and efforts to silence her to the Viet Cong and their communist regime, from which she and her family narrowly escaped.

"In order submit a rebuttal I need to know exactly, clearly and specifically what I am rebutting. This has not been explained to me at any point. In our conversation, the claim centralized vaguely around text messages. I would like to know what that is so I can provide my rebuttal. At this point, my understanding of what I did and what I texted was based on my good faith effort to adhere to what I have been trained for research integrity and data security and what have been asked to do by the lab PI in that same purpose. I can not think of how that would constitute a crime on my part. This experience thus far made me relive the experience of growing up in the communist red state where neighbors can make up claims against neighbors and people would disappear overnight without the opportunity for a fair defense. I am living this same injustice now in America, after my family had traded everything to escape to this country." [*emphasis added*].

3.43    Taking Chair Paltzkill's advice, Meggie Young met with the Ombudsman on two occasions, on or about October 17, 2024, and October 23, 2024, informing her about the discrimination and hostile work environment perpetrated against herself and Dr. Joseph. The Ombudsman agreed with Plaintiff that she and Dr. Joseph were victims of a toxic work environment, and assured Meggie Young that she would discuss the matter with Department Chair Paltzkill.

**While Meggie Young is forced to work from home, Nick Young discovers coercion and corruption between Defendant Baylor College of Medicine and the NIH; Plaintiffs' department chair warns Nick Young to stay silent or else face termination.**

3.44    As October of 2024 dragged on, Meggie Young was forced to sit at home, cut off from the research she loved, and was robbed of precious time she needed to meet grant deadlines and to enable publication by her collaborators. Although directed to "work remotely," Meggie Young, in reality, could not perform critical benchwork outside the lab. No one in the Young lab was collaborating specifically with Meggie Young on the projects at issue. Meggie Young had collaborators in other BCM departments, who had sent her samples for her to process and acquire data. On one grant, she was a named investigator, but the collaborator had to take the samples back in order for a Ph.D. student in their lab to use and publish in their dissertation. Because Meggie Smith could not contribute any research results – being stuck at home -- she has since been replaced

on that grant, costing her and Nick Young income. On another project, her collaborator is a resident in another department at BCM, who sent Dr. Meggie Young samples and six months later is still on results which she was unable to generate while "working remotely" (and later on administrative leave). Thus he is unable to publish or seek grant funds for this project.

3.45     Meanwhile, Nick Young learned about schemes of coercion and corruption taking place between Defendant Baylor College of Medicine and the NIH (which funds most of Plaintiffs' research and the research of many other BCM faculty), and that the Youngs were unknowing victims of the schemes. Specifically, Nick Young learned of the existence of multiple emails between a Deputy Director at the NIH and Defendant Baylor College of Medicine's Vice President of Research, Carolyn Smith. Within the letters, the Deputy Director at the NIH pressured and coerced Defendant BCM, demanding that BCM either address Plaintiffs' employment, or else face not receiving any future NIH funds across the university.

3.46     Throughout October of 2024, Dr. Nick Young continued to complain to Department Chair Palzkill, whom he thought of as a friend, about the ongoing discrimination, retaliation, hostile work environment, and crimes taking place by the three students against Meggie Young, himself, and Dr. Joseph. He also relayed to Palzkill Dr. Taylor's false claim of authorship on one of Dr. Joseph's manuscripts for publication. Palzkill attempted to reassure Nick Young that the situation with the three students was being taken care of by the BCM administration, and thus Nick Young did not need to be involved. Palzkill also ominously warned Nick Young not to further report the discrimination to the university, and not to report what he knew of the coercion and corruption between the NIH Deputy Director and Defendant BCM to anyone, including the university and NIH's Office of the Inspector General, because if Dr. Nick Young did so, he could face termination.

**In swift retaliation, and in response to coercion by the NIH, Defendant Baylor College of Medicine places Meggie and Nick Young on immediate paid Administrative Leave**

3.47    On October 28, 2024, just days after Nick Young received the warning from his chair not to report the discrimination, coercion, and corruption taking place at BCM, and the week after Meggie Young's second meeting raising her concerns to the Ombudsman, Defendant BCM notified both Plaintiffs they were being placed on immediate paid Administrative Leave, pending an investigation. Again, Defendant refused to provide Plaintiffs written copies of the charges against them, or any form of due process prior to their being placed on leave. Defendant immediately locked both Drs. Young out of their university email and other online platforms, and remotely "wiped" Plaintiffs' personal cell phones of all university-related communications. This effectively concealed significant evidence and prevented Plaintiffs from providing evidence in their defense. Plaintiffs were permitted to only talk to a single person from BCM's Employee Relations department (and only pertaining to pay and benefits), and no other person at the university. Notably, these terms precluded internal reports of discrimination, misconduct, and fraud or accessing policy documents.

**Plaintiff Nick Young resolves to blow the whistle on Defendant BCM and the NIH**

3.48    On or about October 31, 2024, despite Palzkill's warning to Nick Young that Defendant BCM would terminate him for doing so, Nick Young, with the moral support of Meggie Young, resolved to blow the whistle on the coercion and corruption taking place between the NIH and Defendant BCM. Unsure where to turn, and prohibited from making a report within BCM, Nick Young made an anonymous call to NIH's Office of Extramural Research. He twice met with the NIH ombudsman via Zoom. At that point, Nick Young spoke only in general terms regarding the alleged coercion and corruption that had taken place. He also informed the NIH officials that he had been threatened with termination for reporting the matter. This seemed to greatly concern

the NIH officials, who encouraged Nick Young to make an official report. Taking their advice, Nick Young spoke on the record with NIH's Office of the Inspector General and the NIH Civil office, providing his real name and asking for possible remedies to his situation.

3.49    On the same day, Nick Young blew the whistle to Congressman Lizzie Fletcher, representative of Texas' 7th Congressional District, describing to her, in writing, the discrimination and retaliation that had taken place against Dr. Meggie Young, Dr. Joseph, and himself by Defendant BCM, as well as the coercion and corruption, at their expense, between the Deputy Director at the NIH and the university.

3.50    In their desperate efforts to seek redress, Plaintiffs first followed the university's grievance policy in an attempt to formalize their complaints to Defendant. After their failed attempts at oral and written resolution through the HR investigations and their department chair, Palzkill, they each filed formal grievances to BCM's chief Human Resources officer, Dane Friend, and the Dean of Faculty, Biykem Bozkurt. Their grievances went unheard and unaddressed by Defendant and its administration, in violation of Defendant's own policies.

**Plaintiffs hire legal counsel and file Title VII charges with the EEOC against Defendant; Defendant responds by reinstating Nick Young, continuing to retaliate against him, placing him on a Professional Improvement Plan, and making him "walk on eggshells" each day at work.**

3.51    After hiring legal counsel, in December 2024, Plaintiffs filed Title VII charges against Defendant Baylor College of Medicine with the EEOC, requesting and receiving right-to-sue letters soon thereafter. In their Title VII charges, Nick Young claimed retaliation by Defendant BCM for reporting discrimination, and Meggie Young claimed discrimination on the basis of race (Asian), color, ethnicity (having a Vietnamese accent and being a non-native English speaker), national origin (from Vietnam), sex (female), and retaliation. The day after receiving an initial letter from Plaintiffs' attorneys, Defendant reinstated Nick Young to his position. However,

Defendant maintained that its investigation found Nick Young violated university policy, and thus he would required to do professional development trainings. The alleged violation related to Dr. Nicolas Young's reporting of misconduct and sabotage in accordance with university policy. The findings of the university's investigation against Nick Young, while unknown to Drs. Young at this time, were presumably negative enough to justify a required professional development trainings. Those findings, and the record of his corrective punishment, would remain in his permanent personnel file, thereby permanently scarring his professional reputation and jeopardizing his prospects of ever finding a comparable position. Additionally, Defendant threatened Nick Young with termination should he ever report discrimination or misconduct again. Both Drs. Nick and Meggie Young requested copies of their investigative reports, but Defendant to date has failed to provide the requested copies.

3.52    Since his reinstatement, Defendant BCM has forced Nick Young to "walk on eggshells" in his daily job, with Palzkill warning Nick Young he needed to be very careful in his dealings with the three students, whom he was still being forced to supervise, if he wished to avoid being terminated him for retaliation. With these threats, Defendant BCM applied pressure on Nick Young to compromise his scientific and academic principles and integrity, particularly with regards to Poncha and Dr. Taylor, who had not met approved academic and scientific standards, and in Dr. Taylor's case, had committed demonstrable fraud. This situation jeopardizes Nick Young's reputation and future prospects in the scientific community.

**In a final retaliatory action, Defendant BCM permanently ends Plaintiff Meggie Young's scientific career.**

3.53    Weeks went by as Nick Young navigated his new post-reinstatement normal, "walking on eggshells" at work, and scrambling to make-up lost time for grant and publication submissions in the wake of his and Meggie Young's months on Administrative Leave. Meanwhile,

Meggie Young remained at home on Administrative Leave, her scientific career and reputation already permanently tarnished, as she had missed vital deadlines for grant submissions, collaborative opportunities, and publications submissions.

3.54    Defendant BCM was determined to permanently destroy Meggie Young's career for having reported discrimination and retaliation, having filed a Title VII charge with the EEOC, securing legal counsel, and for her husband having blown the whistle about the coercion and corruption taking place between the NIH and the university. On February 14, 2025, in a final act of discrimination and retaliation against Meggie Young, Defendant Baylor College of Medicine, through Department Chair Palzkill, notified Plaintiff that her Research Scientist position in Nick Young's lab was being eliminated effective March 16, 2025, using the convenient excuse of Meggie and Nick Young's marital status (despite other similar spousal arrangements at the university and within the department, and despite BCM's prior knowledge and approval of the Youngs' work arrangement, for over three years).

3.55    Meggie Young's requests for copies of any investigative reports were renewed by her attorneys, but she has still never received a copy of any investigative report, or the charges against her. She never received any form of due process.

3.56    Defendant Baylor College of Medicine fostered a discriminatory, hostile, and retaliatory work environment against Dr. Meggie Young, punished her for raising complaints of discrimination, made false allegations against her, robbed her of her life's work, silenced her, harassed her, destroyed her reputation with the scientific community, denied her due process, and ultimately, like the Viet Cong had attempted to do to her and her family, simply made her disappear.

3.57    As the direct and/or proximate result of Defendant Baylor College of Medicine's actions, Plaintiffs Meggie and Nicolas Young have suffered actual damages. Their globally renowned scientific careers and prominent reputations have been permanently tarnished, thereby affecting their ability to find comparable employment in the future. They have been forced to miss deadlines for applying for future competitive federal funding and having their current research published in respected scientific journals, robbing them of income from current and future grants. Defendant deprived Plaintiffs of any procedural due process, or even the opportunity to see the charges against them.

3.58    Instead of protecting Meggie Young from prohibited discrimination and retaliation on the basis of race, color, ethnicity, sex, and national origin, Defendant BCM condoned the discrimination, and punished both Plaintiffs when they reported it to Defendant and the EEOC. Defendant BCM was a willing participant in a coercion and corruption scheme with a Deputy Director at the NIH against Plaintiffs, with Defendant BCM following NIH's corrupt directive to go after Plaintiffs. When Nick Young blew the whistle about the coercion and corruption to the Inspector General and other offices at the NIH, as well as a member of Congress, BCM further retaliated against Plaintiffs, punitively requiring Nick Young to complete professional development trainings, threatening his job if he did not give a pass to students who failed to meet academic, scientific, ethical, and professional standards (up to and including fraud, in the case of Dr. Taylor), and eliminating Meggie Young's position altogether.

3.59    Through its wrongful conduct, Defendant Baylor College of Medicine violated Meggie and Nick Young's civil rights under Title VII of the Civil Rights Act of 1964, depriving them of any form of due process, retaliating against them for Nick Young having exercised his whistleblower rights under a federal law, and breached their contracts. As set forth below and

explained herein, Plaintiffs have filed their charges of discrimination with the EEOC and have received their notices of right to sue, indicating that they have exhausted their administrative remedies.

## IV.  **CAUSES OF ACTION**

4.1    ***Alternative Pleadings***.  To the extent necessary, each of the claims set forth below is pleaded in the alternative, and all allegations contained in each count below are incorporated into each other count by this reference. Further, to the extent necessary, all allegations set forth above in Section III. Factual Background (paragraphs 3.1 through 3.59) of this Complaint are hereby referenced and fully incorporated in each of the claims below by this specific reference, as though set forth in full.

### *Federal Claims*

**Count 1:  Employer Discrimination on the basis of national origin, race, color, sex, and ethnicity under Title VII.**

4.2    Title VII prohibits discrimination based on race, color, sex, ethnicity, or national origin. *See* 42 U.S.C. §2000e-2(a)(1). Specifically, Title VII prohibits discrimination based on those characteristics "with respect to [an employee's] compensation, terms, conditions, or privileges of employment."

4.3    On or about December 11, 2024, Dr. Meggie Young signed and submitted an EEOC charge against Baylor College of Medicine.

4.4    Dr. Meggie Young's charge alleged violation of Title VII by BCM for (1) discrimination on the basis of race, color, ethnicity, sex, and national origin, and for (2) retaliation. Her charge was assigned EEOC Number 460-2025-02003.

4.5     On December 16, 2024, Dr. Meggie Young received her notice of right to sue within ninety days on her claims under Title VII. Meggie Young has timely brought this lawsuit, within ninety days of her receipt of such notice letters.

4.6     As set forth above, Defendant BCM, through its administrators and the NIH, has discriminated against Dr. Meggie Young based on her national origin (from Vietnam), race and color (Asian), ethnicity (having a Vietnamese accent and being a non-native English speaker), and sex (female).

4.7     Incorporating all of the allegations set forth in Section III of this Complaint, Defendant has, through its employees, discriminated against Meggie Young in the terms, conditions, and privileges of her employment. This has caused damage to Meggie Young, for which she, having exhausted her administrative remedies, now sues.

**Count 2:   Retaliation for Protected Conduct Under Title VII.**

4.8     Title VII also prohibits harassment and retaliation by an employer against an employee who opposes an employment practice that violates Title VII. *See* 42 U.S.C. § 2000e-3(a).

4.9     As set forth above, Dr. Meggie Young's EEOC charge alleged retaliation as well as discrimination. Dr. Nick Young also filed a charge with the EEOC, alleging violation of Title VII by BCM for retaliation. His charge was assigned EEOC Number 460-2025-01998. Dr. Nick Young received his right to sue notice on December 30, 2024. He has timely brought this lawsuit, within ninety days of his receipt of such notice letter.

4.10     As set forth above, Defendant BCM, through its employees and administrators, and through its refusal to stop the actions of the three students, has harassed and retaliated against Plaintiffs Meggie Young and Nicolas Young for their protected reporting of the discrimination

perpetuated against Meggie Young and postdoctoral student Dr. Faith Joseph, and for the retaliatory hostile work environment they had been subjected to. This has caused damage to Plaintiffs. Nick and Meggie Young, having exhausted their administrative remedies, now sue.

**Count 3:   Retaliation for Protected Conduct Under 41 U.S.C. § 4712**

4.11      Defendant Baylor College of Medicine is a federal contractor and grantee within the meaning of 41 U.S.C. § 4712, which protects employees of federal contractors from reprisal for disclosing certain information. The statute provides, in pertinent part:

> "An employee of a contractor, subcontractor, grantee, subgrantee, or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant."

41 U.S.C. § 4712(1).

4.12      Here, Nick Young was an employee of federal contractor and grantee Defendant Baylor College of Medicine. As a federal contractor and grantee, Defendant Baylor College had a duty to not abuse its authority in the management of federal contracts and grants it oversaw, including grants from NIH. Upon learning that a Deputy Director at the NIH wrote multiple emails coercing Defendant BCM to "address" Plaintiffs' employment or else risk being denied all future NIH funding across the university, Nick Young, who served as PI on multiple NIH grants in his lab, reported to Congressman Lizzie Fletcher and several offices at the NIH, including the NIH's Inspector General's office, what he believed in good faith to be abuse of authority and a violation of law by Defendant BCM. The "persons or bodies described in paragraph (2)" include "(A) A Member of Congress . . [and]. . (B) An Inspectors General." 41 U.S.C. § 4712(2).

4.13     Nick Young's reporting of Defendant's abuse of authority in participating in coercive activities with a Deputy Director at the NIH was protected activity. Defendant BCM, in its capacity as a federal contractor and grantee, retaliated against Plaintiffs for Dr. Nick Young's exercise of that protected activity, as set forth above and incorporated herein, in violation of 41 U.S.C. § 4712. This has caused damage to both Plaintiffs, as the "reprisal" against Nick Young included eliminating his wife Meggie's employment, derailing her career.

4.14     Although the time period for action by an Inspector General has not yet elapsed, and Plaintiffs have therefore not yet exhausted their remedies, once such administrative remedies have been exhausted, the Plaintiffs intend to seek leave to amend their complaint to add this claim.

### *Pendent State Law Claim*

### Count 4:   Breach of Contract

4.15     As set forth above, the policies of Baylor College of Medicine were a part of each Plaintiff's employment contract. Nicolas Young was first hired by Defendant in 2016 and has been tenured since September of 2021. He entered into a new contract with Defendant each year of his employment. Plaintiff Meggie Young has been employed by Defendant since 2019. Defendant Baylor College of Medicine breached its own policies in 1) failing to follow the established university grievance policy (*See* BCM Policy 02.5.25 – Faculty Grievance Procedures, and BCM Policy 02.5.26 – Staff Grievance Procedures), 2) violating Plaintiffs' free speech and academic freedom rights (*See* BCM Policy 02.2.10 – Academic Freedom), 3) in discriminating against Meggie Young on the basis of race, color, ethnicity, sex, and national origin (*See* BCM Policy 02.2.25 – Policy Regarding Harassment, Discrimination, and Retaliation), 4) in retaliating against Plaintiffs for reporting the discrimination, hostile work environment, and misconduct taking place against Dr. Meggie Young and Dr. Faith Joseph (*Id.*), and 5) in retaliating against

Plaintiffs for Nick Young blowing the whistle on the corruption and coercion Defendant participate in with the NIH (*See* BCM Policy 31.2.02 – Integrity Hotline Policy: Reporting Improper Activity or Wrongdoing, holding "As a federal contractor, BCM is required by federal law to protect persons who, in good faith, report improper activity or wrongdoing from retaliation"). By breaching Plaintiffs' contracts, Defendant BCM has caused damage to Plaintiffs, for which they here sue.

## V.  REQUESTED RELIEF

5.1    As the direct and/or proximate result of Defendant BCM's actions complained of herein, Plaintiffs have been damaged and seek recovery of the full measure of relief and damages against the university, including but not limited to prospective and injunctive relief and actual and/or economic damages, nominal damages, if applicable, damages for mental and physical anguish and emotional distress, equitable relief, and compensatory damages in an amount within the jurisdictional limits of this Court, and all other relief to which they may be entitled.

## VI.  FEES, COSTS, AND INTEREST

6.1        Plaintiffs have retained the law firm of Hill Gilstrap, P.C. to represent them in connection with this matter, and have agreed to pay the law firm its reasonable and necessary attorneys' fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested, Plaintiffs seek to recover their reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law or in equity, specifically including 42 U.S.C. § 2000e-5(k) and 41 U.S.C. § 4712.

6.2        Plaintiffs are also entitled to and seek to recover costs of court, expert witness fees, and pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  CONDITIONS PRECEDENT

7.1        All conditions precedent to the Plaintiffs' recovery on the claims alleged herein have been performed or have occurred.

## VIII.  DEMAND FOR JURY TRIAL

8.1        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial and have tendered, or will tender, the requisite fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that upon final hearing, Plaintiffs recover judgment against Defendant and be awarded:

(a)        any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Defendant (as set forth above more specifically), including both actual and nominal damages;

(b)        their litigation expenses and costs, including but not limited to their attorneys' fees and costs and any applicable expert fees;

(c)        costs of court, pre-judgment and post-judgment interest, at the maximum rate as allowed by law; and

(d)        such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
FRANK HILL
Texas Bar No. 09632000
fhill@hillgilstrap.com
STEFANIE M. KLEIN
Texas Bar No. 11565650
sklein@hillgilstrap.com
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013

**COUNSEL FOR PLAINTIFFS**